## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CHARLES CLASS A, L.P., on Behalf of Itself and All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| BANK OF NOVA SCOTIA; SCOTIA CAPITAL (USA) INC.; SCOTIA HOLDINGS (US) INC.; THE BANK OF NOVA SCOTIA TRUST COMPANY OF NEW YORK; COREY FLAUM; and JOHN DOES 1-25, | |
| Defendants. | |

Plaintiff Robert Charles Class A, L.P., complains upon knowledge, as to itself and its own actions, and upon information and belief, as to all other matters, against Defendants Bank of Nova Scotia, Scotia Capital (USA) Inc., Scotia Holdings (US), Inc., The Bank of Nova Scotia Trust Company of New York, Corey Flaum, and John Does 1-25 (collectively, "Defendants"), as follows:

## SUMMARY OF ALLEGATIONS

1.     This action arises from Defendants' unlawful and intentional manipulation of COMEX Gold Futures, COMEX Silver Futures, NYMEX Platinum Futures, and NYMEX Palladium Futures, and options on those futures contracts (collectively, "precious metals futures contracts") traded on the New York Mercantile Exchange ("NYMEX") and the Commodity Exchange, Inc. ("COMEX") from approximately January 1, 2008 through July 31, 2016 (the

"Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.* (the "CEA"), and the common law.

2.      Defendants are futures traders and the trading firm that employs them.  Defendants manipulated the prices of precious metals futures contracts using a classic manipulative device called "spoofing," whereby Defendants placed orders for precious metals futures contracts that they never intended to execute – and, in fact, canceled before execution – in order to send false and illegitimate supply and demand signals to the market.  In this manner, Defendants manipulated the prices of precious metals futures contracts throughout the Class Period to financially benefit Defendants' trading positions at the expense of other investors, like Plaintiff and members of the Class (defined below).

3.      The unlawful conduct and manipulation described herein is the subject of both criminal and regulatory investigations.  On August 19, 2020, BNS[1] entered into a deferred prosecution agreement ("DPA") with the U.S. Department of Justice ("DOJ")[2] and a settlement with the U.S. Commodity Futures Trading Commission ("CFTC"),[3] agreeing to pay a combined $60.4 million in criminal fines, restitution, and forfeiture of trading profits.  In the Statement of Facts incorporated into the DPA, Defendant BNS admitted that its traders spoofed the markets for precious metals futures contracts ***thousands*** of times throughout the Class Period.[4]

---

[1]      Bank of Nova Scotia, Scotia Capital (USA) Inc., Scotia Holdings (US) Inc., and The Bank of Nova Scotia Trust Company of New York are collectively referred to hereinafter as "BNS."

[2]      *U.S.A. v. The Bank of Nova Scotia*, Case No. 20-707, Deferred Prosecution Agreement, (D.N.J. Aug. 19, 2020), https://www.justice.gov/opa/press-release/file/1306141/download (hereinafter, the "BNS DPA").

[3]      *In the Matter of: The Bank of Nova Scotia*, CFTC Docket No. 20-28, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Aug. 19, 2020), https://www.cftc.gov/media/4411/ enfbankofnovascotiaspoofingorder081920/download (hereinafter, the "CFTC Order").

[4]      BNS DPA, Attachment A, ¶3.

4.    As the CFTC Order states, BNS was ordered to pay a total of $77.4 million for spoofing and making false statements. ***This is the largest civil monetary penalty ever ordered in a spoofing case.***   In particular, BNS was ordered to pay the $60.4 million for spoofing and attempted manipulation, and an additional $17 million for making false and misleading statements to the CFTC regarding spoofing in 2018.  In 2018, BNS had been ordered to pay a much smaller penalty.  But because BNS made false statements in 2018, concealing the breadth of the spoofing that had occurred at BNS,  CFTC states that only now could it address "the true scope and nature of BNS's wrongdoing."[5]

5.    As part of the DPA, BNS agreed that it "shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company" for the conduct described therein, including the allegation that "[b]etween approximately January 2008 and July 2016 . . . four precious metals traders employed by the Company engaged in fraudulent and manipulative trading practices in connection with the purchase and sale of gold, silver, platinum, and palladium futures contracts."[6]

6.    The CFTC also found that BNS's compliance department failed to detect and/or deter the spoofing and that once it did become aware of such manipulative conduct, it failed to stop the misconduct.  Indeed, on multiple occasions, senior members of BNS's compliance team were privy to information regarding unlawful trading ***but did not stop the behavior***, thereby indicating their acquiescence.   CFTC Division of Swap Dealer and Intermediary Oversight

---

[5]    *CFTC Orders The Bank of Nova Scotia to Pay Record $77.4 Million for Spoofing and Making False Statements*, CFTC Press Release No. 8221-20 (Aug. 19, 2020), https://www.cftc.gov/PressRoom/PressReleases/8221-20.

[6]    BNS DPA, ¶33, Attachment A, ¶2.

Director Joshua B. Sterling stated that "BNS's compliance and supervision violations highlight the need for all swap dealers to have the right tone at the top- plus appropriate programs and incentives in place – to instill a meaningful culture of compliance among their personnel."[7]

7.      In addition, on June 25, 2019, Defendant Flaum ("Flaum") was charged by information on, and pled guilty to, one count of attempted price manipulation in the U.S. District Court for the Eastern District of New York in relation to, *inter alia*, the same conduct described in this Complaint.[8]  Flaum is currently awaiting sentencing.[9]

8.      The DOJ and CFTC identified, by way of example, some of the days on which Defendants manipulated precious metals futures contracts prices.  Plaintiff transacted in precious metals futures contracts throughout the Class Period.  Defendants' manipulative conduct caused Plaintiff to suffer a loss on its transactions.

9.      Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the CEA, 7 U.S.C. §25.  This Court also has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that

---

[7]     *CFTC Orders The Bank of Nova Scotia to Pay $127.4 Million for Spoofing, False Statements, Compliance and Supervision Violations*, CFTC Press Release No. 8220-20 (Aug. 19, 2020), https://www.cftc.gov/PressRoom/PressReleases/8220-20.

[8]     *U.S. v. Flaum*, No. 1:19-cr-00338, Information, ECF No. 2 (E.D.N.Y. July 25, 2019) (hereinafter, the "Information").

[9]     *Flaum*, No. 1:19-cr-003338, Minute Order Granting Motion to Continue Sentencing (E.D.N.Y. July 16, 2020).

they form part of the same case or controversy and under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

11.    Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §§1391(b)-(d) and §22 of the CEA, 7 U.S.C. §25(c).  One or more of the Defendants resided, transacted business, were found, or had agents in the Southern District of New York.  BNS has its United States offices in New York, while Defendant Flaum and other Doe Defendants sat at trading desks in New York.  Further, a significant part of the events giving rise to the claims occurred in the Southern District of New York.

12.    Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

## PARTIES

### A.    Plaintiff

13.    Plaintiff Robert Charles Class A, L.P. ("RCA") is a California limited partnership, which, at all relevant times, maintained its principal place of business in San Diego, California. Plaintiff RCA transacted in COMEX Gold Futures and COMEX Silver Futures, and options on those futures contracts throughout the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation.  Defendants spoofed the market for precious metals futures contracts thousands of times throughout the Class Period, which deprived Plaintiff RCA of the ability to transact in a competitive market that was free of manipulation and caused Plaintiff RCA to pay more to purchase, or receive less to sell, precious metals futures contracts.  These artificial

prices caused Plaintiff RCA to earn less profits or suffer greater losses in its trading of precious metals futures contracts during the Class Period.

**B.     Defendants**

14.     Defendant Bank of Nova Scotia is a Canadian corporation with its headquarters in Toronto, Ontario, Canada.  Defendant Bank of Nova Scotia operates in various locations within the United States, including New York and Houston.  Defendant Bank of Nova Scotia employed Defendants Flaum and the Does during the Class Period.  Defendant Flaum and certain Doe defendants were acting within the scope of their employment with BNS when they executed the manipulative trades that are the subject of this Complaint.[10]

15.     BNS maintains a COMEX-registered precious metals depository (vault) in which it stores precious metals at 230-59 International Airport Center Blvd., Building C, Suite 120, Jamaica, Queens, New York.

16.     Defendant Scotia Capital (USA) Inc. is a New York corporation and a registered broker and dealer in securities with the U.S. Securities and Exchange Commission, and a member of the Financial Industry Regulatory Authority and New York Stock Exchange, with its principal place of business located at One Liberty Plaza, New York, New York 10006.  Scotia Capital (USA) Inc. is a wholly owned subsidiary of Scotia Capital Inc., which is a wholly owned subsidiary of BNS.  Scotiabanc Inc. is a Delaware corporation with its principal place of business located at 711 Louisiana Street, Suite 1400, Houston, Texas 77002.  Scotiabanc Inc. is a wholly owned subsidiary of Defendant Scotia Holdings (US) Inc.

---

[10]     BNS DPA, Attachment A, ¶13 ("In placing Manipulative Orders, the Subject Traders were acting within the scope of their employment as employees of [BNS] and with the intent, at least in part, to benefit the Company.").

17.    Defendant Scotia Holdings (US) Inc. is a Delaware corporation with its principal place of business located at 600 Peachtree Street NE, Atlanta, Georgia 30308-2219.  Scotia Holdings (US) Inc. is a wholly owned subsidiary of BNS Investments Inc.  The sole common shareholder of BNS Investments Inc. is BNS and the sole preferred shareholder is Scotia Ventures Limited, which is a wholly owned subsidiary of BNS.

18.    Defendant The Bank of Nova Scotia Trust Company of New York is a trust company regulated by the New York State Department of Financial Services and the Federal Reserve Bank of New York and a subsidiary of Scotia Holdings (USA) Inc., with its principal place of business located at One Liberty Plaza, 165 Broadway, 26th Floor, New York, New York 10006.

19.    Defendants The Bank of Nova Scotia, Scotia Holdings (US) Inc., Scotia Capital (USA) Inc., and The Bank of Nova Scotia Trust Company of New York are collectively referred to herein as "BNS."

20.    Defendant Flaum is a resident of Florida.  Defendant Flaum was an employee of Defendant BNS in its New York offices from at least May 2010 until approximately August 2016. From his desk in New York, he used the following "Tag50" identifications to place manipulative orders:  BSNCFLAUM, CFLAUM, and CCCFLAUM.  The DOJ charged Defendant Flaum with, and Defendant Flaum pled guilty to, one count of attempted price manipulation related to the conduct at issue in this Complaint.[11]

21.    Defendants John Doe Nos. 1-25 are other individuals or entities that participated in the manipulation and unlawful conduct described herein.  These defendants may include other financial firms or employees, agents, or affiliates of Defendant BNS, including, but not limited to,

---

[11]    *See* Information.

the precious metals traders employed by Defendant BNS or one of its affiliates.  For example, the DPA names Subject Trader 2 ("ST-2"), Subject Trader 3 ("ST-3"), and Subject Trader 4 ("ST-4").[12]

## SUBSTANTIVE ALLEGATIONS

### A.    Background

22.    **Commodity Futures Contract**.  A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price at a specified time in the future.  A commodity is the underlying asset upon which a futures contract is based.  The commodity underlying a futures contract can be a physical commodity, *e.g.*, corn or silver, or a financial instrument, *e.g.*, Treasury bills, foreign currencies, or the value of a stock index.

23.    **"Long" and "Short" Futures**.  Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future.  During the Class Period, precious metals futures contracts were predominantly settled through physical delivery, though some instruments settle to cash.

24.    **Offset by Trading**.  Futures market participants trading in futures settling through delivery almost always "offset" their contracts before the expiration month when delivery or settlement occurs.  For example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract.  This sale of one contract offsets or liquidates the earlier purchase of another contract.  The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

---

[12]    BNS DPA, Attachment A, ¶2.

25.      **Options Contract**.  An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period.  The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, precious metals futures contracts).

26.      **Call options** confer upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price).  Call options confer upon the seller, or "option writer," the obligation to sell the commodity at the strike price.  The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit.  The seller (who is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value.  Therefore, the trader that is short a call option would prefer the value of the underlying asset decrease.

27.      **Put options** confer upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price, and they confer upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised.  The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price.  Conversely, the seller of the put option wants the price of the underlying asset to stay above the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

### B.      CME, Globex, and Precious Metals Futures Contracts

28.      Futures contracts are traded on markets designated and regulated by the CFTC.  The CME Group Inc. ("CME Group") owns and operates, among other such Designated Contract Markets ("DCMs"), COMEX and NYMEX.  At all relevant times, COMEX and NYMEX were

registered DCMs with the CFTC, with self-regulatory responsibilities, and were subject to regulation by the CFTC. Thus, COMEX and NYMEX are each a "registered entity" pursuant to §1a(40) of the CEA, 7 U.S.C. §1a(40).

29.     As DCMs pursuant to §5 of the CEA, 7 U.S.C. §7, COMEX and NYMEX specify the terms for each of the futures contracts they list, including the underlying commodity, trading units, tick size,[13] price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

30.     COMEX and NYMEX allow traders to place orders to buy ("bids") or sell ("offers") precious metals futures contracts, electronically through Globex, an electronic trading platform. Trading on Globex is conducted electronically using a visible "order book" that displays quantities of anonymous orders (*i.e.*, offers to sell futures contracts and bids to buy futures contracts) at various price points, or "levels."

31.     COMEX Gold Futures Contracts and COMEX Silver Futures Contracts are listed on the COMEX, subject to the rules and regulations of COMEX, including Chapters 112 and 113 of the COMEX Rulebook, and are traded electronically on the CME's Globex platform.

32.     NYMEX Platinum Futures Contracts and NYMEX Palladium Futures Contracts are listed on the NYMEX, subject to the rules and regulations of NYMEX, including Chapters 105 and 106 of the NYMEX Rulebook, and are traded electronically on the CME's Globex platform.

33.     When an order is matched, *i.e.*, when there exists both a willing buyer and seller for a specified contract at a given price, a transaction occurs and is referred to as a "fill" (or "execution"). At any time before the order is filled, the trader can "cancel" the order. However,

---

[13]     The minimum price increment at which a futures contract could trade on COMEX and NYMEX is called a "tick." COMEX and NYMEX set the value of a tick for each contract that they list.

if an order is partially filled, only the unfilled portion of the order will be cancelled, and that portion of the order is pulled from the order book.

34.    There are different types of orders.  A "limit order" allows the buyer, or seller, to define the maximum purchase price for buying, or minimum sale price for selling, a specified contract.  Any portion of a limit order that can be matched is immediately executed.  A limit order remains on the book until the order is either executed, cancelled, or expires.  Limit orders that remain in the order book, and have not expired or been filled or cancelled, are sometimes referred to as "resting orders."

35.    An "iceberg" or "iceberg order" is a type of order that traders can use when trading futures contracts on COMEX and NYMEX.  In an iceberg order, the total amount of the order is divided into a certain pre-set quantity and only that quantity is visible to other market participants, with the remainder of the order not visible to other market participants.  Whenever the visible portion of the order is filled, the same pre-set quantity of the remaining portion automatically becomes visible; this process repeats until the remainder of the order is either executed or canceled.

36.    The order book, sometimes referred to as the "ladder," allows traders to view the number of orders and the aggregate number of contracts that all traders are actively bidding or offering at a given price level.  Only the total numbers of orders and contracts at various price levels are visible, not the number of traders or the identities of the traders who placed the orders, which means that other market participants cannot detect if a trader is placing orders simultaneously on opposite sides of the market, as Defendants did here.  The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level.  The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell.  The bid-ask spread is the

difference between these two prices.  An illustrative example of a visible order book is contained in FIGURE 1.

**FIGURE 1.**

| Price/Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 106.5 | | | 12 | 20 |
| 106 | | | 10 | 50 |
| 105.5 | | | 15 | 25 |
| 105 | | | 8 | 30 |
| 104 | | | 6 | 20 |
| 103.5 | | | 11 | 100 |
| 103 | | | 8 | 50 |
| 102 | | | 3 | 20 |
| 101.5 | | | 5 | 25 |
| 101 | | | 6 | 30 |
| | | | | |
| 99 | 6 | 50 | | |
| 98.5 | 10 | 20 | | |
| 98 | 14 | 100 | | |
| 97.5 | 8 | 25 | | |
| 97 | 6 | 25 | | |
| 96.5 | 12 | 30 | | |
| 95.5 | 4 | 50 | | |
| 95 | 7 | 40 | | |
| 94 | 5 | 20 | | |
| 94.5 | 7 | 15 | | |
| **TOTAL**: | 79 | 375 | 84 | 370 |

The "Tenth Offer Level." The CME's Order Book showed the first ten offer levels.

The "First Offer Level" or "First Ask Level" (*i.e.*, the lowest offer in the order book).

The "Spread" or "Bid/Ask Spread"

The "First Bid Level" (*i.e.*, the highest bid in the order book).

The "Tenth Bid Level." The CME's Order Book showed the first ten bid levels.

37.    Globex bids and offers are matched according to an algorithm known as "FIFO," which stands for first-in, first-out.  Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority.  Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size.  Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue.

C.      **Spoofing**

Spoofing in General

38.      Spoofing is the act of bidding or offering with the intent, at the time the bid or offer is placed, to cancel the bid or offer before execution.  These orders, the "spoof orders," create a false impression of supply or demand that moves futures contract prices in a desired direction *vis-à-vis* an order the spoofer intends to execute (the "genuine order").  For example, if a trader wants to buy futures contracts at a price below the lowest ask price then available in the market, *i.e.*, a price lower than that at which any market participant would be willing to sell, he/she will place a genuine order, often in the form of an iceberg order to reduce any upward pricing pressure, at that below market price and work to spoof prices lower.  To do this, the trader will place one or more large spoof orders – orders the trader never intends to execute – to sell a substantial amount of the same contract on the opposite side of the market.  The spoof orders are made at a price that is at or above the first-ask level (the lowest-ask price available in the market), meaning that they are passive orders that will not be immediately filled.  These large orders falsely signal that investors are selling their futures contracts, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the genuine order.  The manipulator cancels the large spoof orders before they get filled, so the trader never enters a transaction at that price level.

39.      The DOJ itself noted in its charging information against BNS that spoofing served to "inject false and misleading information into the precious metals futures market in order to deceive other market participants into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.  This false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals

futures contracts at quantities, prices, and times that they otherwise likely would not have traded."[14]

40.    Figures 2a and 2b below show the order book imbalance and artificial appearance of supply and demand forces that spoofing causes.  Figure 2a is a hypothetical order book.  The best bid is two ticks away from the best offer and, therefore, no executable trades are present.  For the purposes of this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid.  Figure 2b shows how that same order book would appear after a hypothetical genuine order and series of spoof orders are entered.  Specifically, the order book in Figure 2b shows that an iceberg buy order is placed to buy 50 contracts, but only showing five contracts to the market at a time.  Then, spoof orders are placed on the opposite side of the market: one spoof order for 200 contracts is placed at the first-offer level; four spoof orders for a total of 100 contracts are also placed at the first-offer level; and six additional spoof orders for a total of 250 contracts are placed at the second-offer level.  Following these spoof orders, the order book shows a significant imbalance, giving the appearance of far more sellers in the market than buyers, which signals artificial supply to market participants and leads to artificial, downward price pressure.

---

[14]    *U.S. v. Bank of Nova Scotia*, No. 3:20-cr-00707, Information, ¶4, ECF No. 1 (D.N.J. Aug. 19, 2020).

FIGURE 2a.

Order Book Before the Spoofing Begins

| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 25.050 | | | 25 | 185 |
| 25.045 | | | 14 | 100 |
| 25.040 | | | 28 | 150 |
| 25.035 | | | 16 | 201 |
| 25.030 | | | 12 | 144 |
| 25.025 | | | 10 | 100 |
| 25.020 | | | 5 | 112 |
| 25.015 | | | 10 | 206 |
| 25.010 | | | 14 | 120 |
| 25.005 | | | 15 | 386 |
| | | | | |
| 24.095 | 18 | 242 | | |
| 24.090 | 20 | 314 | | |
| 24.085 | 22 | 163 | | |
| 24.080 | 24 | 264 | | |
| 24.075 | 10 | 102 | | |
| 24.070 | 12 | 148 | | |
| 24.065 | 18 | 104 | | |
| 24.060 | 11 | 94 | | |
| 24.055 | 6 | 85 | | |
| 24.050 | 12 | 227 | | |
| **TOTAL**: | 153 | 1743 | 149 | 1704 |

**FIGURE 2b.**

Order Book After the Spoofing

| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 25.050 | | | 25 | 185 |
| 25.045 | | | 14 | 100 |
| 25.040 | | | 28 | 150 |
| 25.035 | | | 16 | 201 |
| 25.030 | | | 12 | 144 |
| 25.025 | | | 10 | 100 |
| 25.020 | | | 5 | 112 |
| 25.015 | | | 10 | 206 |
| 25.010 | | | ~~14~~ 20 | ~~120~~ 370 |
| 25.005 | | | ~~15~~ 20 | ~~386~~ 686 |
| | | | | |
| 24.095 | ~~18~~ 19 | ~~242~~ 247 | | |
| 24.090 | 20 | 314 | | |
| 24.085 | 22 | 163 | | |
| 24.080 | 24 | 264 | | |
| 24.075 | 10 | 102 | | |
| 24.070 | 12 | 148 | | |
| 24.065 | 18 | 104 | | |
| 24.060 | 11 | 94 | | |
| 24.055 | 6 | 85 | | |
| 24.050 | 12 | 227 | | |
| **TOTAL**: | 154 | 1748 | 160 | 2254 |

Six spoof orders to sell a total of 250 contracts are placed at the second offer level.

One spoof order to sell 200 contracts is placed at the first offer level.

An additional four spoof orders to sell a total 100 contracts are placed at the first offer level.

A primary order to buy 50 contracts is placed as an iceberg order. Because this is an iceberg order, the market only sees 1 new order for 5 contracts, reducing upward price pressure that might partially counteract the spoof orders.

41.    The same technique can also be used in reverse to manipulate prices artificially higher. For example, a trader can place an order to sell futures contracts above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of their initial sell order.

42.    In each instance, the trader profits because spoofing allows the trader to buy futures contracts at below the current market price, or to sell futures contracts at above the current market price.

Spoofing in the Precious Metals Market

43.     In recent years, spoofing has been rampant in the COMEX and NYMEX precious metals markets.  Traders at various banks have been caught by regulators and fined – with many forbidden from trading commodities again.

44.     On March 31, 2016, the CFTC entered into a consent order with traders Heet Khara and Nasim Salim for spoofing precious metal futures between February 2015 and April 2015. Khara and Salim were required to pay $1.38 million and $1.31 million civil fines, respectively. Both were also permanently enjoined from trading commodities in the United States.[15]

45.     On January 29, 2018, the CFTC filed and settled charges against Deutsche Bank AG and Deutsche Bank Securities Inc. for spoofing COMEX precious metal futures from at least February 2008 to at least September 2014.  Deutsche Bank AG and Deutsche Bank Securities Inc., collectively, were required to pay a $30 million civil fine.[16]

46.     Also on January 29, 2018, the CFTC filed a complaint against traders James Vorley and Cedric Chanu for spoofing precious metal futures between at least May 2008 and at least July 2013 while employed at an unidentified bank, which was, on information and belief, Deutsche Bank.[17]

---

[15]     *Commodity Futures Trading Commission v. Khara*, No. 1:15-cv-03497, Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief, ECF No. 35 (S.D.N.Y. Mar. 31, 2016).

[16]     *In the Matter of: Deutsche Bank AG and Deutsche Bank Securities, Inc.*, CFTC Docket No. 18-06, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Jan. 29, 2018), https://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfdeut schebankagorder012918.pdf.

[17]     *Commodity Futures Trading Commission v. Vorley*, No. 1:18-cv-00603, Complaint, ECF No. 1 (N.D. Ill. Jan. 26, 2018).

47.     Also on January 29, 2018, the CFTC filed and settled charges against UBS AG for spoofing COMEX precious metal futures from at least January 2008 to at least December 2013. UBS AG was required to pay a $30 million civil fine.[18]

48.     Also on January 29, 2018, the CFTC filed and settled charges against HSBC Securities (USA) Inc. for spoofing COMEX precious metal futures from at least July 2011 to at least August 2014.  HSBC Securities (USA) Inc. was required to pay a $1.3 million civil fine.[19]

49.     On June 25, 2019, the CFTC filed and settled charges against Merrill Lynch Commodities, Inc. for spoofing precious metal futures from at least April 2016 to at least January 2018.  Mitsubishi International Corporation was required to pay monetary sanctions totaling approximately $25 million, including a civil penalty of $11.5 million, over $2.3 million in restitution, and disgorgement of $11.1 million.[20]

50.     On August 20, 2019, Christian Trunz pled guilty to one count of conspiracy and one count of spoofing based on allegations that he engaged in spoofing precious metal futures on thousands of different occasions between 2007 and 2016 while employed at two unidentified

---

[18]     *In the Matter of: UBS AG*, CFTC Docket No. 18-07, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Jan. 29, 2018), https://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfusbagorder012918.pdf.

[19]     *In the Matter of: HSBC Securities (USA) Inc.*, CFTC Docket No. 18-08, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Jan. 29, 2018), https://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfhsbcsecuritiesorder012918.pdf.

[20]     *In the Matter of: Merrill Lynch Commodities, Inc.*, CFTC Docket No. 19-07, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC June 25, 2019), https://www.cftc.gov/media/2141/enfmerrilllynchorder062519/download.

banks, one of which was, on information and belief, JP Morgan.[21]  On September 16, 2019, the

CFTC filed and settled charges against Trunz.[22]  Trunz is currently awaiting sentencing.[23]

51.    On September 16, 2019, the CFTC filed and settled charges against John Lawrence

and his employer, Heraeus Metals New York LLC, for spoofing COMEX precious metal futures

from at least May 2017 to at least January 2018.  Lawrence and Heraeus Metals New York LLC

were required to pay $130,000 and $900,000 civil fines, respectively.[24]

52.    On September 16, 2019, the CFTC filed a complaint against traders Michael Nowak

and Gregg Smith for spoofing precious metal futures on thousands of different occasions between

2008 and 2015 while employed at two unidentified banks, one of which was, on information and

belief, JP Morgan.[25]

53.    On September 30, 2019, the CFTC filed and settled charges against Morgan Stanley

Capital Group Inc. for spoofing precious metal futures from at least November 2013 to at least

---

[21]    *U.S. v. Trunz*, No. 1:19-cr-00375, Information, ECF No. 4 (E.D.N.Y. Aug. 19, 2019).

[22]    *In the Matter of: Christian Trunz*, CFTC Docket No. 19-26, Order Instituting Proceedings
Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing
Remedial    Sanctions    (CFTC    Sept.    16,    2019),    https://www.cftc.gov/media/2516/
enfchristiantrunzorder091619/download.

[23]    *Trunz*, No. 1:19-cr-00375, Minute Order Granting Motion to Continue Sentencing
(E.D.N.Y. May 4, 2020).

[24]    *In the Matter of: John Lawrence*, CFTC Docket No. 19-27, Order Instituting Proceedings
Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing
Remedial Sanctions (CFTC Sept. 16, 2019), https://www.cftc.gov/media/2521/download?
name=enfjohnlawrenceorder091619; *In the Matter of: Heraeus Metals New York LLC*, CFTC
Docket No. 19-28, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the
Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Sept. 16,
2019), https://www.cftc.gov/media/2511/enfheraeusmetalsorder091619/download.

[25]    *Commodity Futures Trading Commission v. Nowak*, No. 1:19-cv-06163, Complaint, ECF
No. 1 (N.D. Ill. Sept. 16, 2019).

November 2014.  Morgan Stanley Capital Group Inc. was required to pay a $1.5 million civil fine.[26]

54.    On September 30, 2019, the CFTC filed and settled charges against Mitsubishi International Corporation for spoofing precious metal futures from at least April 2016 to at least January 2018.  Mitsubishi International Corporation was required to pay a $400,000 civil fine.[27]

### D.    Defendants Manipulated the Prices of Precious Metals Futures Contracts and Options Contracts to Artificial Levels Throughout the Class Period

55.    In the BNS DPA, Defendant BNS admitted that during the period from at least 2008 through 2016, precious metals traders employed by BNS, including Defendant Flaum, engaged in a scheme to deceive by placing thousands of spoof orders that they never intended to execute, with the intent to create the false and misleading impression of increased supply and demand in the market in order to:  (a) induce other market participants to trade at times, prices, and quantities that they would not have absent Defendants' manipulation of the market; and (b) financially benefit Defendants at the expense of Plaintiff and the Class.

56.    Defendants placed the spoof orders electronically from computers at least located at Defendant BNS's offices in New York onto the NYMEX and COMEX.  The illegitimate supply and demand signals conveyed by the spoof orders were thereby disseminated to the market and artificially moved prevailing market prices in the direction of Defendants' genuine orders, injuring

---

[26]    *In the Matter of: Morgan Stanley Capital Group Inc.*, CFTC Docket No. 19-44, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Sept. 30, 2019), https://www.cftc.gov/media/2671/%20enfmorganstanleyorder093019/download.

[27]    *In the Matter of: Mitsubishi International Corporation*, CFTC Docket No. 19-46, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC Sept. 30, 2019), https://www.cftc.gov/media/2681/enfmitsubishiorder093019/download.

Plaintiff and Class members.  During his plea hearing, Defendant Flaum admitted that the spoof orders were designed to – and did – artificially move the prices of precious metals futures contracts.[28]

57.    Defendants' manipulation of the markets for precious metals futures contracts caused prices to be artificial throughout the Class Period.  The BNS DPA provided just a handful of examples of the thousands of spoof orders that Defendants placed during the Class Period, which are outlined below:

### 1.    January 19, 2010

58.    On or about January 19, 2010, ST-2, in the course of his employment with Defendant BNS, placed a spoof order to buy a total of approximately 110 COMEX Gold Futures contracts at a price of $1,133.80, sending false demand signals to the market in order to fill his genuine order on the sell side of the market at an artificial price.  Three milliseconds after ST-2 placed his spoof buy order, the market price moved, and his pre-existing genuine sell order at the price of $1,134.00 was filled.  Less than one second later, ST-2 cancelled the spoof orders without any of them being filled.[29]

### 2.    August 22, 2011

59.    On August 22, 2011, Defendant Flaum, in the course of his employment with Defendant BNS, placed a genuine order to sell 25 COMEX Gold Futures contracts at a price of $1,891.00.  Thirteen seconds later, Flaum placed a spoof order to buy 245 COMEX Gold Futures contracts at a price of $1,890.20, sending false demand signals to the market in order to fill Flaum's genuine order on the sell side of the market at an artificial price.  Less than two seconds after the

---

[28]    *See Flaum*, No. 1:19-cr-00334, Transcript at 5-6, ECF No. 7 (Dec. 26, 2019).

[29]    BNS DPA, Attachment A, ¶6.

spoof order was placed, Flaum's genuine order was filled. Less than two seconds after his genuine order was filled, Flaum canceled the spoof orders without any of them being filled.[30]

### 3.    June 28, 2012

60.    On June 28, 2012, in the course of his employment with Defendant BNS, ST-3 placed a genuine iceberg order to sell three COMEX Gold Futures contracts at a price of $1,569.60. ST-3 then placed a spoof order to buy 150 COMEX Gold Futures contracts at a price of $1,569.00, sending false demand signals to the market in order to fill ST-3's genuine order on the sell side of the market at an artificial price. Twenty-one milliseconds after the spoof order was placed, ST-3's genuine order began to fill, and within one second of the spoof order, ST-3's genuine order was fully executed. Less than three seconds after his genuine order was filled, ST-3 canceled the spoof orders without any of them being filled.[31]

### 4.    August 1, 2013

61.    On August 1, 2013, ST-4, in the course of his employment with Defendant BNS, placed two genuine iceberg orders to buy a total of 10 COMEX Gold Futures contracts at a price of $1,320.00. Four seconds later, ST-4 began placing a series of contract spoof orders to sell a total of 57 COMEX Gold Futures contracts at a price of $1,320.00, sending false supply signals to the market in order to fill ST-4's genuine order on the buy side of the market at an artificial price. Shortly after the spoof order was placed, ST-4's genuine orders began to fill, and within one second of the spoof order, ST-4's genuine orders were fully executed. Less than 15 seconds after placing them, ST-4 canceled the spoof orders without any of them being filled.[32]

---

[30]    BNS DPA, Attachment A, ¶10.

[31]    BNS DPA, Attachment A, ¶7.

[32]    BNS DPA, Attachment A, ¶11.

### 5.    December 31, 2015

62.    On December 31, 2015, Defendant Flaum, in the course of his employment with Defendant BNS, placed a genuine order to sell five COMEX Gold Futures contracts at a price of $1,060.40.  Eighty-three seconds later, Flaum placed a spoof order to buy 245 COMEX Gold Futures contracts at a price of $1,059.90, sending false demand signals to the market in order to fill Flaum's genuine order on the sell side of the market at an artificial price.  One millisecond after the spoof order was placed, Flaum's genuine order filled.  Less than two seconds after his genuine order was executed, Flaum canceled the spoof orders without any of them being filled.[33]

### 6.    May 25, 2016

63.    On or about May 25, 2016, Defendant Flaum, in the course of his employment with Defendant BNS, placed a genuine order to buy three COMEX Gold Futures contracts at a price of $1,222.50.  Approximately 10 seconds later, Flaum placed a spoof order to sell 145 COMEX Gold Futures contracts at a price of $1,223.20, sending false supply signals to the market in order to fill Flaum's genuine order on the buy side of the market at an artificial price.  Seventy-two milliseconds after the spoof order was placed, Flaum's genuine order filled.  Less than two seconds after his genuine order was executed, Flaum canceled the spoof orders without any of them being filled.[34]

64.    On the same day, Defendant Flaum, in the course of his employment with Defendant BNS, placed a genuine order to buy 10 COMEX Gold Futures contracts at a price of $1,221.70.  Approximately six seconds later, Flaum placed a spoof order to sell 145 COMEX Gold Futures contracts at a price of $1,222.20, sending false supply signals to the market in order to fill

---

[33]    BNS DPA, Attachment A, ¶5.

[34]    BNS DPA, Attachment A, ¶8.

Flaum's genuine order on the buy side of the market at an artificial price. One millisecond after the spoof order was placed, Flaum's genuine order filled. As the price continued to fall, Flaum placed another genuine order to buy 10 COMEX Gold Futures contracts at a price of $1,221.40. After his second genuine order was executed, and less than 25 seconds after they were placed, Flaum canceled the spoof orders without any of them being filled.[35]

65.    The above are just a few illustrative examples of Defendants' pervasive spoofing behavior throughout the entire class period, during which Plaintiff and the Class routinely bought and sold Precious Metals Futures.

66.    Through their manipulative conduct, Defendants unlawfully increased their profits at the expense of Plaintiff and the Class. As a result of Defendants' sophisticated manipulative strategy, innocent market participants – such as Plaintiff – who traded NYMEX and COMEX precious metals futures and options contracts, traded at artificial prices throughout the Class Period caused by Defendants' manipulation.

## CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and as representative of the following Class:

> All persons and entities that purchased or sold any NYMEX Platinum Futures contract, NYMEX Palladium Futures contract, COMEX Silver Futures contract, COMEX Gold Futures contract, or any option on those futures contracts, during the period of at least January 1, 2008 through at least July 31, 2016.[36]

68.    Excluded from the Class are Defendants, their officers and directors, management, employees, subsidiaries, or affiliates. Also excluded from the Class is the Judge presiding over

---

[35]    BNS DPA, Attachment A, ¶9.

[36]    Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

this action, his or her law clerks, spouse, any other person within the third degree of relationship living in the Judge's household, the spouse of such person, and the U.S. government.

69.     The Class is so numerous that joinder of the individual members of the proposed Class is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least hundreds, if not thousands, of geographically dispersed Class members transacted in NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, or options on those futures contracts throughout the Class Period.

70.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law, as complained of herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws, as alleged herein.

71.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests that are adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including commodity futures manipulation class action litigation.

72.     Common questions of law or fact exist, as to Plaintiff and all Class members, and these common questions predominate over any questions affecting only individual members of the Class.  These predominant questions of law and/or fact common to the Class include, without limitation:

        (a)      whether Defendants manipulated the price of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts,

COMEX Gold Futures contracts, or the price of options on those futures contracts in violation of the CEA;

(b)    whether Defendants manipulated the price of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, or the price of options on those futures contracts to be artificial;

(c)    whether such manipulation caused a cognizable injury under the CEA;

(d)    whether Defendants' unlawful conduct caused actual damages to Plaintiff and the Class;

(e)    whether Defendants were unjustly enriched at the expense of Plaintiff and members of the Class;

(f)    the operative time period and extent of Defendants' unlawful conduct; and

(g)    the appropriate nature and measure of Class-wide relief.

73.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not afford to individually litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

74.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

75.     The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

76.     By its very nature, the unlawful activity alleged herein was self-concealing. Defendants engaged in secret and surreptitious activities to submit and cancel trade orders in order to manipulate the prices of NYMEX and COMEX precious metals futures contracts to artificial levels.

77.     Defendants concealed their manipulative acts by, *inter alia*, placing orders electronically with the intent to buy or sell NYMEX and COMEX precious metals futures contracts at a certain price, even though they secretly had no intent of transacting at that level.  At no point did Defendants disclose that they placed these orders to manipulate the prices of NYMEX and COMEX precious metals futures contracts.  Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' manipulation any earlier than the date of the public disclosures thereof.

78.     Additionally, Defendant BNS has made repeated public statements that they maintain established procedures that ensure compliance with all applicable laws and regulations.

79.     Further, as discussed herein, while Defendant BNS was subjected to a regulatory fine in 2018 for potential spoofing behavior, the CFTC has now revealed that BNS made "false

statements and omissions" to regulators during the prior investigation and it is only now, in 2020, that the true nature and extent of the misconduct came to light.[37]

80.    As a result, Plaintiff and the Class had no knowledge of, and could not have had knowledge of, Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of reasonable diligence before August 19, 2020, when the CFTC Order and BNS DPA were released.

81.    Upon the public release of such information on August 19, 2020, Plaintiff quickly engaged legal counsel and investigated the misconduct reported to determine whether it was affected during the relevant period and whether it had a legal claim for which to seek redress.

82.    As a result of the concealment of Defendants' unlawful conduct through misrepresentations and/or active omissions regarding their conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statutes of limitations affecting the rights of the causes of action asserted by Plaintiff.

83.    Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## FIRST CLAIM FOR RELIEF

### For Manipulation in Violation of the Commodity Exchange Act
### 7 U.S.C. §§1, *et seq.*
### (As Against All Defendants)

84.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

---

[37]    CFTC Order at 2; *see also* BNS DPA, ¶4.b ("As a result of the Company's incomplete disclosure, and inaccurate representations on which the CFTC relied, the CFTC and the Company entered into a resolution that did not reflect the full extent of Flaum's spoofing . . . .").

85.    Defendants through their acts alleged herein, from at least January 1, 2008 through at least July 31, 2016, specifically intended to, and did, cause unlawful and artificial prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts in violation of the CEA, 7 U.S.C. §§1, *et seq.*, through their use of fictitious buy and sell orders, and other manipulative conduct.

86.    Defendants manipulated the price of a commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

87.    During the Class Period, the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts did not result from the legitimate market information and the forces of supply and demand.  Instead, the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

88.    Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution.  Defendants did this with the intent to inject illegitimate information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions.  As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts.

89.     Through their use of spoofing and other manipulative techniques, Defendants manipulated the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts throughout the Class Period and thereby caused damages to Plaintiff and Class members who purchased or sold such instruments at the artificially inflated or deflated prices.

90.     At all times and in all circumstances previously alleged herein, Defendants had the ability to cause, and did cause, artificial prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts.  Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts and were aware of the effects of spoofing and other manipulative conduct on those markets.

91.     By their intentional misconduct, Defendants each violated §§6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§9, 13b, 13(a), and 25(a), throughout the Class Period.

92.     As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damages and injury-in-fact due to the artificial prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts to which Plaintiff and the Class would not have been subject, but for the unlawful conduct of the Defendants, as alleged herein.

93.     Plaintiff and members of the Class are each entitled to actual damages sustained in NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver

Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

**For Employing a Manipulative and Deceptive Device in Violation
of the Commodity Exchange Act
7 U.S.C. §§1, *et seq.* and Regulation 180.1(a)
(As Against All Defendants)**

94.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

95.     Defendants' unlawful conduct, as described herein, including the use of systematically submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts constitutes the employment of a manipulative and deceptive device.

96.     As alleged herein, Defendants acted intentionally – and, even if they are found to not have acted intentionally, then at least acted recklessly – in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiff and the Class.

97.     By their intentional misconduct, Defendants each violated §§6(c) and 22(a) of the CEA, 7 U.S.C. §§9 and 25(a), throughout the Class Period.

98.     As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damages and injury-in-fact due to artificial prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts to which Plaintiff and the Class would not have been subject, but for the unlawful conduct of the Defendants, as alleged herein.

99.     Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

### THIRD CLAIM FOR RELIEF

**For Principal-Agent Liability for Violation of the Commodity Exchange Act
7 U.S.C. §§1, *et seq.*
(As Against All Defendants)**

100.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

101.     Defendant BNS is liable under §2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of its agents, representatives, and/or other persons acting for it in the scope of their employment.

102.     Plaintiff and members of the Class are each entitled to damages for the violation alleged herein.

### FOURTH CLAIM FOR RELIEF

**Unjust Enrichment
(As Against All Defendants)**

103.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

104.     Defendants financially benefited from their unlawful acts.  As alleged herein, Defendants submitted spoof orders electronically and employed other manipulative techniques to manipulate the prices of NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts in an artificial direction.  Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions at the expense of Plaintiff and the Class.

105.     These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact at artificial prices for NYMEX Platinum Futures contracts, NYMEX Palladium Futures contracts, COMEX Silver Futures contracts, COMEX Gold Futures contracts, and options on those futures contracts.

106.     As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

107.     Each Defendant should pay restitution for its own unjust enrichment to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the requested relief as follows:

A.     For an Order certifying this lawsuit as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), designating Plaintiff as the Class Representative and appointing its counsel as Class Counsel;

B.     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest, at the maximum rate allowable by law;

C.     For a judgment awarding Plaintiff and the Class restitution of any and all sums of Defendants' unjust enrichment;

D.     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

E.     For such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury for all issues so triable.

Dated:  August 25, 2020

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 *s/* Christopher M. Burke
Christopher M. Burke (CB-3648)
Thomas K. Boardman (TB-0530)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
cburke@scott-scott.com
tboardman@scott-scott.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Amanda F. Lawrence (AL-8804)
Michael P. Srodoski (*pro hac vice* forthcoming)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile:  860-537-4432
alawrence@scott-scott.com
msrodoski@scott-scott.com

Louis F. Burke
**LOUIS F. BURKE PC**
460 Park Avenue
New York, NY 10022
Telephone: 212-682-1700
lburke@lfblaw.com

*Attorneys for Plaintiff and the Proposed Class*
